United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN YOUNG, | ) No. C 14-03550 EJD (PR) |
| Petitioner, | ) **ORDER DENYING PETITION FOR** |
| | ) **WRIT OF HABEAS CORPUS;** |
| v. | ) **DENYING CERTIFICATE OF** |
| | ) **APPEALABILITY** |
| RON BARNES, Warden, | ) |
| Respondent. | ) |
| | ) |

Petitioner has filed a <u>pro se</u> petition for a writ of habeas corpus under 28

U.S.C. § 2254 challenging his state conviction.  Respondent filed an answer on the

merits, and Petitioner filed a traverse.  For the reasons set forth below, the Petition

for a Writ of Habeas Corpus is **DENIED**.

## BACKGROUND

After a jury trial in Alameda County Superior Court, Petitioner was found

guilty of rape, second degree robbery, false imprisonment, and evading a peace

officer.  Petitioner also admitted to a prior serious felony strike conviction.  On June

27, 2012, Petitioner was sentenced to twenty-three years and eight months in state

prison.  (Ans. at 1, Docket No. 37-1.)

Petitioner appealed his conviction, and the state appellate court affirmed.  (Id. at 5.)  The state high court denied review.  (Id.)

Petitioner filed the instant federal habeas petition on August 8, 2014.

**FACTUAL BACKGROUND**

The California Court of Appeal summarized the facts as follows:

*Jane Doe*

At approximately 10:00 p.m. on July 27, 2011, Jane Doe and her friend Asheia Clemon went to a bar in Oakland called Apartment C.  Doe lived in Sacramento but had been staying with a friend while she was visiting Oakland.  That night, Doe was planning on staying at her ex-boyfriend's place before returning to Sacramento the following day.

After the two women had been at the bar for a little while, they went outside to smoke a cigarette.  They were talking about a book Clemon was reading when defendant, whom neither had met before, joined in their conversation, surprising them both by knowing about the book.  Doe found defendant physically attractive, and when he asked for her phone number, she gave it to him.  He called her cell phone, which showed an incoming call from "Dontay Masters."  The three conversed for about 15 minutes before Clemon and Doe went back inside the bar.

Doe went outside another time, where she again encountered defendant.  They engaged in further conversation, agreeing to get together sometime in the future.  According to Doe, defendant was "very flirty" during their interactions.

As the evening progressed, it became too late for Doe to stay at her ex-boyfriend's place, so she made arrangements to stay with Clemon.  By closing time, Doe had lost track of Clemon, so she called her on her cell phone and learned that Clemon was not in the bar.  Defendant offered to walk Doe to her car, and she accepted.  As they arrived at her car, Clemon showed up.  The two women began arguing because Clemon was going to entertain male company at her place and no longer wanted Doe to stay overnight.  Doe decided to drive back to Sacramento that night, so she got in her car and drove away.

After driving a short distance, Doe stopped at a gas station and got out her laptop so she could charge her cell phone.  While at the gas station, she called Clemon, but never got in touch with her.  Around the same time, she received a call from defendant, who told her Clemon was walking in an unsafe neighborhood and her phone battery had died.  Because Doe wanted to find Clemon, she agreed to pick up defendant, who was on 88th Avenue, so he could help her find friend.  Defendant directed her to where he was, and after

getting slightly lost, she found him in about 15 minutes. She pulled over to let him in, moving into the passenger seat so he could drive. Doe[] testified that "he seemed like he was very nice, he was going to help me find my drunk friend who I knew was drunk and knew was drunk and he made a comment about it, her not being safe to be over there. That showed to me he was concerned some kind of way...."

Rather than driving off, however, defendant pulled forward about 10 feet, stopping behind a burgundy van that was parked on the side of the road. Taking Doe's car keys with him, defendant walked up to the van (purportedly to get some marijuana that he and Doe were going to smoke) and opened one of the double doors on the passenger side. While defendant was at the van, Doe finally got in touch with Clemon, telling her she was with defendant and they were going to smoke some marijuana.

Defendant returned to Doe's car, telling her, "I want to talk to you." He opened her car door, again calmly telling her he wanted to talk. Defendant then "snapped," forcefully grabbing Doe with both hands – first her shirt, then her neck – and "snatched" her out of the car. His demeanor became very aggressive, his voice threatening, and he dragged her to the van. He threw her inside, climbed in behind her, and locked the door.

Doe was very shocked but was trying to remain calm, not screaming because she was afraid defendant was going to kill her. He was very agitated and threatened to beat her up several times. He also pulled a gun part way out from underneath one of the seats, telling her it had recently been used to commit a murder.

At some point, defendant calmed down, so Doe started asking him questions – about his family, his upbringing, his children – to try to keep him calm. She asked if she could have a cigarette, hoping defendant would let her get cigarettes out of her car, but he refused. Defendant asked if she had ever been punched in the face. When she responded, "No," he acted as if he were about to punch her, laughing when she flinched. At another point, he reached over and choked Doe "real hard," telling her "he could kill [her] right here and [she would] just be another dead body."

Eventually, defendant began grabbing Doe, kissing her a couple of times and putting his hand inside her shirt to grab her breasts. It became apparent he intended to have sex with her, and she tried pushing him off, but he continued to grab her. As she resisted, defendant was getting angrier, pulling at her pants and ripping a hole in them. Doe eventually gave in, removing one of her boots and pant legs. As she testified at trial, "He had be back there for a number of hours. I was scared the whole time because I was getting more like if he would just take what he want, he would leave me alone and not beat me up."

Doe repeatedly told defendant "he didn't have to do this," but he nevertheless climbed on top of her. She did not want to have sex with him, but she was ultimately resigned to it happening so she

decided she was "just going to give him what he wants so he [would] leave [her] alone." She asked him to use a condom, taking one out of her purse, but he refused. Defendant then vaginally penetrated her, having difficulty at first because Doe was menstruating at the time and was wearing a tampon. After a few minutes, defendant ejaculated inside of her.

After defendant raped Doe, he picked up her purse and emptied out its contents. He took her phone and wallet, removing her I.D. from the wallet and threatening to come find her if he needed to. He also took jewelry she was wearing. Defendant then left the van, got into Doe's car, and drove off.

Doe got out of the van and ran down the street until she eventually found someone who would help her. She was driven to a nearby police station, where she reported that she had been raped. When she was describing what happened, she told the officer that the assailant had pulled a gun on her at the gas station, grabbed her, and taken her to a van where he sexually assaulted her. Doe, who had a criminal record herself, told this false story because she was worried the police would not believe she had been raped if she told them she willingly drove with defendant to the location where the assault occurred. As she explained at trial, "I just didn't want anyone to think that I wanted what happened to me."

The police drove Doe back to the location of the van, which was still there. She was then transported to the hospital, where she underwent a lengthy sexual assault examination. When she disrobed for the exam, she was still wearing the tampon that had been in place when defendant raped her. After the exam, she called Clemon, who came and picked her up. Doe later returned to Sacramento.

Two days later, in the early morning hours, an Oakland police officer was on patrol when he spotted Doe's car parked in an East Oakland neighborhood. He observed the car from a distance, and about an hour later, defendant approached it, got in, and started the engine, before turning the engine off, getting out, and walking down the street. Two minutes later, he returned to the car, this time driving off.

The officer began a pursuit, with other units joining in. He attempted to make a traffic stop by obstructing defendant's route with his police car, but defendant was able to get around his car, fleeing towards San Leandro. After a high speed chase, defendant collided with a police car, finally coming to a stop when he crashed into a parked car and a house. Following a struggle, defendant was eventually subdued and placed under arrest. Doe's car, which was totaled, was taken to a tow yard.

A few days later, detectives came to see Doe at her home in Sacramento. She repeated her story that defendant had abducted her from the gas station, again telling this version because she did not want to give the police a reason not to take her seriously. The detectives told her they had found her car and had a suspect in custody. Shown a photo lineup, Doe identified defendant as the man

United States District Court

For the Northern District of California

who raped her.

Doe traveled to the tow yard where her car was being held. [FN3] She saw her car but was not permitted to touch anything in it. Instead, her personal belongings were put in a bag and brought to her.  She got most of her possessions back, including her wallet and cell phone, but her laptop and jewelry were missing.  Defendant's cell phone was also among the items given to her.  The car was destroyed.

> FN3. Doe was apparently not the registered owner of the car at the time of the assault.  After the assault, the owner transferred title to her, which enabled her to regain her possessions at the tow yard.

In August, as Doe prepared to testify at defendant's preliminary hearing, she told the prosecutor the truth about how she ended up with defendant.  She did so because the prosecutor told her to be truthful and "now that he had been caught it was serious and [she] didn't want to lie on the stand...."

At trial, defense counsel elicited the following inconsistencies in Doe's story:

Doe told the police on the morning of the sexual assault, the nurse at the hospital, and the detectives who came to interview her in Sacramento that she had been carjacked by defendant at a gas station.

At the preliminary hearing, Doe testified that defendant orally copulated her, but she testified at trial and told the nurse who performed the examination that there was no oral sex.

Doe told the nurse during the examination that defendant had a gun in the van but she never saw it.  At trial, Doe testified that defendant pulled a gun partially out from underneath a seat and she saw its black grip.

### Robin Doe

On November 16, 2000, Robin Doe drove a friend to a liquor store in Oakland.  Once at the store, she remained in the car while her friend went inside.  As she was waiting, defendant, whom she had never seen before, walked up to the car, opened the door, got in, and ordered her to drive off, threatening that he had a gun. Defendant allowed Robin to make a stop at her brother's house, telling her that if she made one mistake, he would kill her and her brother.  Once there, Robin hoped to give her brother a clue as to what was going on, but he did not pick up on her hints.  After Robin used the restroom, she and defendant left, and he directed her to drive to a dark location where he raped her.  During the ordeal, defendant "was talking crazy out of his head, saying all kind of things," at one point saying he "hate[d] bitches" and at another threatening to kill her and blow her head off.  Defendant drove them to another location where he sexually assaulted her again.  Robin

was finally able to jump out of the car and run off, and defendant drove away in her car.

### *Elizabeth Doe*

On the night of January 15, 2004, Elizabeth Doe, who lived in Sacramento, stopped at liquor store on her way home from work. Defendant was outside the store and followed her in. As she exited the store after making a purchase, defendant continued to follow her, asking if she wanted to buy some marijuana. She declined because she already had some at home. Defendant told her he was selling it so he could get to Oakland to see his children and asked if she could give him a ride down the street. She agreed, driving him to the area where he wanted to be dropped off and pulling over to let him out. Rather than getting out, however, defendant made a reference to Elizabeth's supposed "baby daddy" – Jaray or Dray – having killed one of his friends. She told him he must have her mixed up with someone else because that was not the name of her children's father. He then said he was going to kill her, ordered her into the back seat, and drove to a different location. After pulling over, defendant told her he was going to rape her. As he tried to climb into the back seat, Elizabeth was able to open one of the car doors and escape. As she ran off, defendant grabbed her, tearing her shirt off. Defendant drove away in her car, and she was able to locate someone to help her. Her car was recovered as week later "in two pieces."

As best as Elizabeth could recall at trial, defendant was convicted of grand theft auto.

(Ans. Ex. C at 2-7.)

## DISCUSSION

### I.   <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

1   presented in the State court proceeding." 28 U.S.C. § 2254(d).

2          "Under the 'contrary to' clause, a federal habeas court may grant the writ if

3   the state court arrives at a conclusion opposite to that reached by [the Supreme]

4   Court on a question of law or if the state court decides a case differently than [the]

5   Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529

6   U.S. 362, 412-13 (2000).  The only definitive source of clearly established federal

7   law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the

8   Supreme Court as of the time of the state court decision.  Williams, 529 U.S. at 412;

9   Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).  While circuit law may be

10  "persuasive authority" for purposes of determining whether a state court decision is

11  an unreasonable application of Supreme Court precedent, only the Supreme Court's

12  holdings are binding on the state courts and only those holdings need be

13  "reasonably" applied.  Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled

14  on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

15         "Under the 'unreasonable application' clause, a federal habeas court may

16  grant the writ if the state court identifies the correct governing legal principle from

17  [the Supreme Court's] decisions but unreasonably applies that principle to the facts

18  of the prisoner's case." Williams, 529 U.S. at 413.  "Under § 2254(d)(1)'s

19  'unreasonable application' clause, . . . a federal habeas court may not issue the writ

20  simply because that court concludes in its independent judgment that the relevant

21  state-court decision applied clearly established federal law erroneously or

22  incorrectly." Id. at 411.  A federal habeas court making the "unreasonable

23  application" inquiry should ask whether the state court's application of clearly

24  established federal law was "objectively unreasonable." Id. at 409.  The federal

25  habeas court must presume correct any determination of a factual issue made by a

26  state court unless the petitioner rebuts the presumption of correctness by clear and

27  convincing evidence.  28 U.S.C. § 2254(e)(1).

28         The Supreme Court has vigorously and repeatedly affirmed that under

United States District Court
For the Northern District of California

1    AEDPA, there is a heightened level of deference a federal habeas court must give to

2    state court decisions.  See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam);

3    Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Felkner v. Jackson, 131 S. Ct.

4    1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review,

5    AEDPA 'imposes a highly deferential standard for evaluating state-court rulings'

6    and 'demands that state-court decisions be given the benefit of the doubt.'"  Id. at

7    1307 (citation omitted).  With these principles in mind regarding the standard and

8    limited scope of review in which this Court may engage in federal habeas

9    proceedings, the Court addresses Petitioner's claims.

10   **II.    Claims and Analysis**

11        Petitioner claims the following grounds for federal habeas relief: (1) the trial

12   court denied his right to self-representation; (2) the trial court allowed the

13   destruction of exculpatory evidence without allowing Petitioner prior access; and (3)

14   the trial court improperly admitted evidence of prior bad acts.

15        **A.    Right to Self-Representation**

16        Petitioner claims that he was denied his right to represent himself as the trial

17   judge did not appropriately rule on his Faretta motion.

18        The California Court of Appeal set forth the following background:

19        On August 2, 2011, defendant was arraigned on rape and
          other charges.  At the arraignment, he advised the court that he
20        wanted to represent himself.  The court granted his Faretta request.
          Defendant also declined to waive time.

21        Following a preliminary hearing, defendant was charged with
22        the following six counts: (1) forcible rape (§ 261, subd. (a)(2)) with a
          sex offense and kidnapping enhancement (§ 667.61, subd. (d)(2));
23        (2) forcible oral copulation (§ 288a, subd. (c)(2)(A)); (3) second
          degree robbery (§ 211); (4) kidnapping to commit another crime (§
24        209, subd. (b)(1)); (5) evading a peace officer (Veh. Code, § 2800.2,
          subd. (a)); and (6) assaulting a peace officer (§ 245, subd. (c)).  It
25        was also alleged that defendant had a prior serious felony strike
          conviction (§§ 667, subd. (a)/ 1170.12, subd. (c)(2)), three prior
26        prison terms (§ 667.5, subd. (b)), and a conviction for possession of a
          controlled substance for which he received felony probation.

27        On October 12, the court heard defendant's motion to dismiss
28        the information.  It granted the motion as to count 2 (forced oral

United States District Court
For the Northern District of California

copulation) and denied it as to the remaining counts. [FN4] The case was then continued to October 24 for a jury trial.

> FN4. The district attorney subsequently filed an amended information that eliminated the forced oral copulation count.

On October 24, the matter was sent out for trial. The court began the session by confirming with defendant that the had been representing himself and wished to continue to do so. After the court advised defendant of the serious nature of the charges against him and the potential exposure he was facing, and encouraged him to speak to a public defender, defendant confirmed that he wished to continue in pro per. Defendant executed another *Faretta* waiver, and proceeded under self-representation. He did, however, agree to have advisory counsel appointed.

Discussion ensued about various pretrial matters, including defendant's clothing for trial. Defendant told the court about an argument he had with his family over his clothing, stating: "I feel like I haven't had a fair – I'm not going to have a fair trial anyway, so I told them that I would rather just don't even wear no clothes.... I just received exculpatory material for my defendant, and I have not been able to been provided an investigator. So I already feel that I'm in a no-win situation."

The court responded: "All right. What you're saying is going to compel me to withdraw your *Faretta*. If that is the way you feel, then I'm considering withdrawing your *Faretta*, ability to represent yourself and I'm referring you to the public defender. You cannot go into this process with that attitude, Mr. Young. Simply not, not good for you. Not good for the system. If you feel that you're being railroaded, if you feel that you have exculpatory information, you would need more time to look into that. And you should have a lawyer looking into these records now." The court advised defendant to pull his no time waiver and consult with a lawyer. After considerable back and forth on this, the court continued the matter to the following morning, advising defendant that if he had not made any changes to his status, they would proceed with a jury trial. If, on the other hand, he waived time, the trial could be continued.

The following morning, defendant withdrew his no time waiver, and the court appointed an investigator to assist him. The matter was then continued to allow defendant's investigator time to prepare.

On January 26, 2012, the court heard motions in limine. It also heard lengthy argument on a motion of defendant to exclude evidence due to the police failure to preserve Doe's car, the van, and defendant's cell phone. The court denied the motion, after which this exchange occurred:

"THE DEFENDANT: [M]y last request is, since I'm not going to be given a fair trial, I just ask that my presence through the whole trial be waived.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"THE COURT: No, you have to be here.  You have to be here.

"THE DEFENDANT: I'm going to say I'm not going to show up because I'm not receiving a fair trial.

"THE COURT: You are receiving as fair a trial as everybody.

"THE DEFENDANT: Because the Supreme Courts –

"THE COURT: No. What happens is the trial court rules on what they see and looks at the Supreme Court rulings.  And just because the Supreme Court says it, it may or may not apply to that particular situation.  So in this situation the Court has made a ruling. [¶] And you have to come in.  You wanted to be in this situation and so you have to come in and represent yourself.  That's the only way this is going to get taken care of.

"THE DEFENDANT: I would like to waive.  I want to tell the officers I don't want to come in here.  I will come to court but since I see that the Court's –

"THE COURT: That doesn't make any sense.  It doesn't make any sense.  You can just be here.

"THE DEFENDANT: I see that the Court is setting it up against me to be found guilty.

"THE COURT: The court's not setting up anything against you.

"THE DEFENDANT: All the Supreme Court, even the 14th Amendment is being denied me. [¶]...[¶]... And like I said, I would just like to waive my appearance and have nothing else to do with the trial.

"THE COURT: You cannot waive your appearance.

"THE DEFENDANT: I don't have no more responses to anything that has to do with the trial.

"THE COURT: Well, but you have to be here.  You do whatever you please.  If you want to represent yourself, then we want you to represent yourself.  And I'm helping you as best I can. I'm not doing a lot, but I'm helping, trying to guide you and help so that things aren't too bad here."

In light of defendant's statements, the prosecutor requested the appointment of standby counsel, and the court acknowledged it as a reasonable request, stating, "We may need standby.  It appeared to me this morning that Mr. Young was quite capable of handling the case and he was very articulate and doing everything he needed to do."  The dialogue then continued:

"THE DEFENDANT: I would like to have standby because

United States District Court

For the Northern District of California

I'm refusing to come into court.

"THE COURT: Every time something doesn't go your way as an attorney or representing yourself, every time someone rules against you or what you think it should be, you can't just say, okay, I'm going to take my papers and go home and not show up.  You can't do that.

"THE DEFENDANT: I'm just saying I understand that you're more favorable with the district attorney.

"THE COURT: I'm not in favor.  I'm just trying to follow the law.  [¶]...[¶] So sometimes you may not know all of the intricacies of these cases.  And I'm sure everyone looks at the cases and sees that in the light that's best for them, which I don't fault you for doing that.  That's very lawyer-like for doing that.  [¶] So what we'll do is maybe we should call court-appointed and have someone here Monday morning as a standby but make it clear that we've started the process."

The discussion turned to the issue of defendant's clothes, with the court asking defendant if his family brought his clothes.  This exchange then occurred:

"THE DEFENDANT: They was going to bring it Monday but I'm going to let them know I'm not getting a fair trial so I'm not dressing out.  I'll just stay in my regular clothes.

"THE COURT: That's not a good idea.

"THE DEFENDANT: I mean I don't want to front in front of the jury like I'm getting a fair trial when I'm getting railroaded.

"THE COURT: You're not getting railroaded.  All right. However you want to do it, but we'll put it on the record that if you decided Monday not to dress out."  The matter was then continued to January 30 for trial.

On January 30, the court began by expressing concern over defendant's comments at the prior session, inquiring whether he planned to continue representing himself.  Defendant responded affirmatively, also advising that he intended to remain silent throughout the trial, not making an opening statement or closing argument or cross-examining any witnesses.  And he confirmed that he intended to wear his jail clothing rather than street clothes.

There followed extensive back-and-forth about whether defendant was being treated fairly, defendant insisting that he was being railroaded and the court insisting that he was being treated the same as the prosecutor and all other defendants.  When defendant maintained his position that he wanted to represent himself, the court responded, "Well, you can if you represent yourself.  You can continue if you're going to represent yourself.  But if you're going to sit in here and not ask any questions and not participate, I can't let that – that would be a travesty of justice, and I don't feel that would

be right, so I'm trying to uphold your equal protection of the laws." The court then gave defendant a choice: "We're here for you to get a fair trial. And that's what I am trying to assure of now. I'm not going to sit here and let you just sit here in that little, well, you can there in the yellow suit but someone's going to represent you. Either you're going to represent yourself or I'm going to refer you to the public defender's office. If they can represent you, they will represent you. If they can't represent you, then we will send it to court-appointed. And we will not get started and we won't be able to do this case in the time constraints that we were talking about right now." Defendant ultimately agreed to meet with a public defender.

Back on the record after that meeting, defendant consented to representation. In order to afford his attorney time to prepare for trial, defendant withdrew his no time waiver. The prosecutor lodged an objection that in requesting representation on the eve of trial, which would likely necessitate a continuance, defendant was "simply stalling, delaying, and frankly playing games with the procedure at this point." The matter was continued to March 26 to afford defendant's counsel [time] to prepare for trial.

At the March 26 hearing, defendant's counsel informed the court that defendant wanted to withdraw his time waiver. The court advised defendant against it, telling him that the court and the prosecution were ready to commence trial, but that his counsel needed time to make sure she was prepared. Defendant relented, and the matter was continued to April 11.

On April 11, the court and counsel discussed numerous scheduling matters, and the matter was continued to April 16. What happened at the hearing will be described in detail below but, in short, defendant's counsel advised the court that defendant wished to represent himself. After the court confirmed that what defendant in fact wanted was a new attorney, the court held a *Marsden* [FN5] hearing and denied defendant's request for new counsel.

FN5. *People v. Marsden* (1970) 2Cal.3d 118 (*Marsden*).

Jury selection commenced on April 18, and a jury was seated on April 25. Testimony was heard over the course of five days. After just over two days of deliberations, the jury found defendant guilty of forcible rape (without the kidnapping enhancement), second degree robbery, false imprisonment (lesser included offense of kidnapping to commit another crime), and evading a peace officer. It was unable to reach a verdict on the charge of assaulting a peace officer, and a mistrial was declared on that count. Defendant admitted the prior convictions, and the court found them to be true.

On June 27, the matter came on for sentencing. Defendant began by making another *Marsden* motion, which the court denied. He then stated that he would rather exercise his right to self-representation than be represented by the public defendant, and the court granted his request to continue in pro per. Defendant then requested the appointment of a new attorney to look over his claims of ineffective assistance of counsel. The court denied that request, as

1   well as his motion for new trial.

2   (Ans. Ex. C at 8-13.)

3   The state appellate court next reviewed the exchange that occurred at the

4   outset of the April 16 hearing, when Petitioner's attorney advised the court that

5   Petitioner wished to invoke his right to self-representation:

> "THE COURT: I'm not going through this again.  I'm not going through this again.  This is just like game playing, Mr. Young, because when we started out, you were representing yourself.  You get upset every time something doesn't go your way, then you say you want to be represented by an attorney. [¶] We're in the middle of trial now.  That's it.  I'm not going to deal with you as a pro per any more.  It's just too much.  It's just too difficult.  You change your mind every time things don't go your way.  It's one thing.  You want to do it.  Next minute you don't want to do it.  And it's all a delay tactic.  No.
>
> "THE DEFENDANT: Your Honor, I'm not going to delay. I'm ready for trial right now.
>
> "THE COURT: I don't mean that.  I mean all of this.  Now we have Ms. McNamara [defendant's counsel].  We've waited all this time while you were saying you wanted to be represented by the public defender's office.  You said that's what you wanted to do. You got mad the minute I ruled against you.  [¶] Now what's the problem?
>
> "THE DEFENDANT: Well, I don't want to argue the matter in front of the district attorney.  That's why I don't want to be represented by my attorney.
>
> "THE COURT: You want a *Marsden* motion, is that what you want, or you want to go pro per
>
> "THE DEFENDANT: A *Marsden* motion.
>
> "THE COURT: All right..."

The court then held a hearing on defendant's *Marden* request, which it denied.  It then went on to rule on pending motions in limine.  The hearing concluded with this exchange:

> "THE COURT: The only other thing is on the issue of, the pro per issue, just for the record, Mr. Young, the reason that you were wanting to go pro per is that you had some issues with your attorney; is that correct, the issues that we had previously discussed in the *Marsden* motion?
>
> "THE DEFENDANT: Yes.
>
> "THE COURT: All right.  And at this juncture are you

1    comfortable with your attorney?

2        "THE DEFENDANT: No.

3        "THE COURT: All right.  Well, at this juncture the Court, based on him wanting to represent himself because he didn't like the way the attorney was presenting the case, but the Court made a ruling that the *Marsden* was denied in that situation. [¶] So in terms of the pro per, the Court has made the inquiry.  And the Court has denied this pro per status because I think, No, it was confused with the *Marsden* issue but it was also something that we had dealt with previously, and that's quite untimely." [FN6]

        FN6. Defendant unsuccessfully renewed his *Marsden* motion on April 26 and May 1, 8, and 9.

9    (Ans. Ex. C at 14-15.)

10    The California Court of Appeal then denied the claim under the relevant law:

11    **The Law**

12        The law governing a criminal defendant's right to self-representation is well established.  As our Supreme Court has summarized it: "A criminal defendant has a right to represent himself at trial under the Sixth Amendment of the United States Constitution. [Citations.] A trial court must grant a defendant's request for self-representation if three conditions are met.  First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.] Second, he must make his request unequivocally. [Citations.] Third, he must make his request within a reasonable time before trial. [Citations.] *Faretta* error is reversible per se. [Citations.]" (*People v. Welch* (1999) 20Cal.4th 701, 729; see also *Faretta*, *supra*, 422 U.S. 806, 835.)

19        It has been said that in evaluating defendant's request for self-representation, the court applies a "stringent standard" for judging the adequacy of the defendant's invocation of the right because of the strong presumption against waiver of the right to counsel. (*United States v. Weisz* (D.C. Cir. 1983) 718 F.2d 413, 425-426.) "[T]he court should draw reasonable inference against waiver of the right to counsel." (*People v. Marshall* (1997) 15 Cal.4th 1, 23 (*Marshall*); see also *Brewer v. Williams* (1977) 430 U.S. 387, 404 ["courts indulge in every reasonable presumption against waiver" of the post arraignment right to counsel].)  "Unlike the right to representation by counsel, '"[T]he right of self-representation is waived unless defendants articulately and unmistakably demand to proceed pro se."' [Citation]." (*People v. Dent* (2003) 30 Cal.4th 213, 218.)

26

27    **Defendant's Request to Proceed In Pro Per Was Equivocal**

28    Defendant contends that he unequivocally asserted his right to

**United States District Court**
For the Northern District of California

self-representation at the outset of the hearing on pretrial motions. He is correct that the hearing commenced with defense counsel's declaration that defendant wanted to proceed without an attorney. But that does not end the inquiry.  As our Supreme Court stated in *Marshall*, *supra*, 15 Cal.4th at pp. 25-26, "[T]he court's duty goes beyond determining that some of defendant's words amount to a motion for self-representation.  The court should evaluate all of a defendant's words and conduct to decide whether he or she truly wishes to give up the right to counsel and represent himself or herself and unequivocally has made that clear."  Given defendant's words and conduct here – most significantly, his confirmation that what he actually wanted was a *Marsden* hearing – it cannot be said that he expressed a clear and unambiguous desire to represent himself.  (See *id.* at p. 25 ["When we examine the record of the hearing at which defendant assertedly invoked his right of self-representation, we conclude that the request was ambivalent in the context of that hearing and also was made to delay and disrupt the proceedings."].)

Defendant counters that the fact he indicated he wanted a *Marsden* hearing did not negate what was initially an unequivocal *Faretta* request.  It is true that a conditional *Faretta* request – such as, "if I can't have a new attorney, I want to represent myself" – can constitute an unequivocal *Faretta* request.  (See, e.g., *People v Michaels* (2002) 28 Cal.4th 486, 524; *United States v. Hernandez* (2000) 203 F.3d 614, 621-622, overruled on other grounds in *United States v. Ferguson* (9th Cir. 2009) 560 F.3d 1060, 1068, fn. 4.)  But that is not what happened here.  After the court inquired if defendant was moving to relieve his counsel or to represent himself, he answered only that he wanted a *Marsden* hearing.  He did not indicate that if his *Marsden* request was denied, then he wanted to proceed pro per.  Likewise, after the court denied his *Marsden* request, defendant did not then express a desire to proceed in pro per.

Additionally, as the court noted in *Marshall*, *supra*, 15 Cal.4th at pp. 21-22, several courts have held that a *Faretta* motion made on a whim or out of frustration is not unequivocal.  (See *id.* at pp. 21-22 and cases therein collected.)  That was the situation here. Defendant believed his attorney was neither communicating with him nor conducting an adequate investigation.  He felt she had a closer relationship with the district attorney than she did with him. Defendant was clearly frustrated with her, and the record suggests that defendant's desire to proceed in pro per was borne out of that frustration.

Further undermining defendant's claim is the fact that he knew how to make an unequivocal *Faretta* request when he intended to do so, as he did on two other occasions.  And he clearly knew the difference between a *Faretta* motion and a *Marsden* motion, as he made six separate *Marsden* motions over the course of the proceeding.  Indeed, after the denial of his June 27 *Marsden* motion, defendant then made a *Faretta* motion, which the court granted.  He could have done the same on April 16, should he have wished to proceed in pro per.  He did not.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10

Finally, defendant suggests that the court treated him in such a manner as to convey to him that a further *Faretta* request would have been futile.  (See, e.g., *People v. Dent*, *supra*, 30 Cal.4th at p. 219 [trial court's instruction not to speak coupled with its categorical denial of the *Faretta* request "may well have convinced defendant the self-representation option was simply unavailable, and making the request against would be futile."]; *United States v. Hernandez*, *supra*, 203 F.3d at p. 622 [trial court's "impatient resistance" towards defendant's *Faretta* request suggested that further requests were futile].)  As defendant explains it, "Here, the trial court had threatened to have appellant shackled if he acted out, which the court seemed to consider to have occurred based on the *Faretta* request and the *Marsden* hearing, although appellant was not disruptive nor disrespectful.  It is not surprising that appellant would consider any further requests to represent himself at that juncture to be both futile and to be met with resistance and anger from the court."  The court did indeed advise defendant that he would be shackled if he acted up but, as evidenced by the following colloquy, it was not because it believed he acted up by making a *Faretta* or *Marsden* request:

11

"THE COURT: *Marsden* motion is denied.

12

"THE DEFENDANT: Can I just leave?

13
14

"THE COURT: No. And if you act up, we're going to have you shackled in here.  Okay?

15

"THE DEFENDANT: What's that going to do, shackle me?

16

"THE COURT: Keep you here.  I'm not going to have any problems.  Okay?

17
18

"THE DEFENDANT: I'm saying you want to shackle me like a dog by saying I'm not going to be here.

19
20
21

"THE COURT: I'm not going to do it unless you do something to indicate I need to do it.  I'm just letting you know this, because I don't want you in front of the jury behaving a certain way. I don't want the jury to think badly of you.  I want you to be dressed."

22
23
24

Clearly, the comment concerning shackling defendant was directed at maintaining his presence at trial.  Nothing suggests it was made in retaliation for his *Faretta* or *Marsden* motion.  And a review of the record reveals no other conduct by the court that could reasonably be construed as having dissuaded defendant from making a further *Faretta* request.

25
26
27

Because we have concluded that defendant's *Faretta* request was equivocal – and thus did not satisfy one of the three criteria for granting it – we need not consider whether his requests satisfied the remaining requirements.

28

(Ans. Ex. C at 15-19.)

1

2

3

4

5

6

United States District Court

For the Northern District of California

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A criminal defendant has a Sixth Amendment right to self-representation. Faretta v. California, 422 U.S. 806, 832 (1975). But a defendant's decision to represent himself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of securing delay. Id. at 835; United States v. Arlt, 41 F.3d 516, 519 (9th Cir. 1994); Adams v. Carroll, 875 F.2d 1441, 1444 & n.3 (9th Cir. 1989).

Here, the state appellate court's decision denying Petitioner's claim was based on the lack of the first Faretta requirement – that the decision be unequivocal. 422 U.S. at 832 ; see also Meeks v. Craven, 482 F.2d 465, 466-68 (9th Cir. 1973); accord Armant v. Marquez, 772 F.2d 552 (9th Cir. 1985). The requirement of unequivocality serves two purposes: it ensures that the defendant does not inadvertently waive his right to counsel, Meeks, 482 F.2d at 467, and also prevents the defendant from taking advantage of the mutual exclusivity of the rights to counsel and self-representation, Adams v. Carroll, 875 F.2d 1441, 1444 (9th Cir. 1989). If a defendant equivocates, he is presumed to have requested the assistance of counsel. Id.; see also United States v. Bennett, 539 F.2d 45, 49-51 (10th Cir.) (defendant who unquestionably vacillated between representation by counsel and self-representation until 6 days before trial forfeited right to self-representation); United States v. Oakey, 853 F.2d 551, 552-54 (7th Cir. 1988) (defendant's request for self-representation with co-counsel found equivocal because no right to such "hybrid" representation; request to proceed pro se properly denied). The court considers "three factors to determine whether a request for self-representation is unequivocal: the timing of a request, the manner in which the request was made, and whether the defendant repeatedly made the request." Stenson v. Lambert, 504 F.3d 873, 882 (9th Cir. 2007).

The record supports the state appellate court's conclusion that Petitioner's request for self-representation was not unequivocal. Although the hearing on April 16 began with defense counsel advising the court that Petitioner wanted to represent

United States District Court

For the Northern District of California

himself, the trial judge clarified with Petitioner that what he really wanted was a Marsden motion.  See supra at 13.  Petitioner never indicated that if his Marsden motion was denied, he wanted to proceed "pro per."  Id.  Even after the Marsden motion was denied and Petitioner continued to express dissatisfaction with his counsel, he did not clearly state that he wished to proceed self-represented.  Id. at 14.  The state appellate court was not unreasonable in finding that Petitioner's discontent was borne out of frustration with counsel whom he believed was not communicating with him or conducting an adequate investigation and had a "closer relationship" with the district attorney than with him.  Id. at 15.  Accordingly, it cannot be said that Petitioner was clearly stating a desire to waive counsel and proceed pro per rather than merely expressing that frustration.  Lastly, Petitioner was certainly aware of how to make an unequivocal Faretta motion as the state appellate court observed that Petitioner had done so on two other occasions.  Id.  The state appellate court also reasonably concluded that Petitioner knew the difference between a Faretta motion and a Marsden motion as he had made six separate Marsden motions over the course of the proceeding.  Id. at 15-16.

As to Petitioner's argument that any further Faretta motion would have been futile, the state appellate court reasonably found it had no merit based on their review of the record.  See supra at 16.  The state court found that the comment regarding shackling "was directed at maintaining [Petitioner's] presence at trial."  Id  Petitioner had repeatedly requested not to be present at trial and again expressed a desire to leave the proceeding, so the trial court responded with a warning of what would happen if he "act[ed] up."  Id.  There was no suggestion that shackles would be imposed in retaliation for any future Faretta motion.  In fact, Petitioner made other Marsden motions and another Faretta motion which was granted on June 27.  Id.  Based on his actions, it cannot be said that Petitioner actually believed that future motions would be futile.

Based on the foregoing, it cannot be said that the state court's rejection of this

1  claim was an unreasonable application of, or contrary to, Supreme Court precedent

2  or based on an unreasonable determination of the facts in light of the evidence

3  presented in the State court proceeding.  28 U.S.C. § 2254(d).  Petitioner is not

4  entitled to habeas relief on this claim.

5  **B.  Destruction of Evidence**

6  Petitioner's second claim is that the trial court allowed the destruction of

7  exculpatory evidence without allowing him prior access to inspect or review it

8  which "could have assisted in [his] defense or allowed [him] a fair trial."  (Pet. at 3.)

9  Specifically, Petitioner claims that his cell phone, which was found in the alleged

10  victim's car, had exculpatory value and that it was intentionally lost by the police

11  when they released it to the victim.  (Id., Ex. A at 1-2.)  Petitioner also claims that

12  the police failed to preserve Doe's car and the van, both of which had exculpatory

13  value.

14  The state appellate court found no error:

15  **Background**

16  Defendant's cell phone was in Doe's car at the time of
defendant's arrest, and was inadvertently turned over to Doe when

17  she claimed her personal belonging at the tow yard.  At some point,
Doe informed the prosecutor she had defendant's phone, but when

18  the prosecutor later contacted her to ask for it back, she was unable
to find it.  In a statement to a prosecution investigator, Doe explained

19  that she had lived in different locations after the incident, and when
she retrieved her property from storage, she could not locate the

20  phone.  The prosecutor made repeated requests that she continue to
look for it, but the phone never surfaced.

21
Doe was not the registered owner of the car she was driving

22  the night of the incident.  After the car was recovered, the owner
transferred title to Doe, who was then able to retrieve her belongings

23  from the car.  The car was subsequently destroyed, and Doe received
the $500 value of the car when it was scrapped.

24
According to defendant, the police impounded the van.  When

25  his brother, who apparently owned the van, went to retrieve it, the
police would not release it to him.  Without further notice, the van

26  was later released to the tow lot and destroyed.

27
Defendant filed a motion to exclude evidence based on the
police department's purported failure to preserve evidence in

28  violation of his due process rights under *California v. Trombetta*

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

(1984) 467 U.S. 479 and *Arizona v. Youngblood* (1988) 488 U.S. 51. The trial court denied defendant's motion, finding he made no showing that the evidence was exculpatory or that the police failed to preserve the evidence in bad faith.

**The Law**

"'Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence "that might be expected to play a significant role in the suspect's defense." [Citations.] To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." [Citations.] The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." [Citation.] In such case, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." [Citations.] [¶] 'On review, we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling.'" (*People v. Carter* (2005) 36 Cal.4th 1215, 1246; see also *Arizona v. Youngblood, supra*, 488 U.S. 51 at p. 56, fn. * ["[T]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."]; *California v. Trombetta, supra*, 467 U.S. at p. 489 [government violates a defendant's right to due process if unavailable evidence possessed "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."]; *People v. Memro* (1995) 11 Cal.4th 786, 831 [defendant bears burden of showing bad faith on the part of the police].)

**Substantial Evidence Supports the Trial Court's Conclusion That the Evidence Was Not Destroyed in Bad Faith**

We can readily dispose of defendant's contention that his right to due process was violated by the police department's willful failure to preserve potentially exculpatory evidence. Defendant presented no evidence demonstrating that the police had reason to believe that the items in dispute had any exculpatory value, or that they in fact held any potentially exculpatory value. As to the phone, defendant alleges that the police "routinely check cell messages and photographs on telephone [*sic*] and the failure to do this and/or the failure to recognize the exculpatory nature of the evidence once done, demonstrates bad faith participation in the destruction of this phone." This argument ignores the significant fact that the police were not responsible for the loss of the phone, as it was inadvertently given to Doe at the tow lot, and she then misplaced it. That fact

United States District Court

For the Northern District of California

aside, defendant does not identify what exculpatory material the phone possessed, other than complaining that the phone records – made available to defendant in lieu of the phone – "did not show the contents of [text] messages or other items on the phone [and] he also lost the email and pictures from this phone."  None of this suggests that the police had any reason to believe that the phone contained any potentially exculpatory evidence, nor that they destroyed it in bad faith.

Defendant claims Doe's car held exculpatory evidence because Doe testified that she let defendant drive in part because of the car's mechanical problems when, in fact, the car did not have mechanical problems.  The sexual assault did not occur in the car, and defendant made no showing that the police had reason to believe Doe's testimony regarding why she permitted defendant to drive her car would be subject to dispute.

Finally, as to the van, defendant claims it possessed potentially exculpatory evidence because pictures of the rear window "would have demonstrated that Jane Doe made an unreliable report to the police officer when she said she had seen him drive away."  The police retrieved, inventoried, and preserved the contents of the van and took photographs of the vehicle.  They thus attempted to preserve everything of value in the van.  They had no reason to believe that the view out the rear window was in anyway relevant, nor has defendant established that it was, and there was no evidence that the police acted in bad faith in releasing the van to the tow yard.

(Ans. Ex. C at 23-25.)

The government has a duty to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means.  See California v. Trombetta, 467 U.S. 479, 489 (1984); Grisby v. Blodgett, 130 F.3d 365, 371 (9th Cir. 1997).

Although the good or bad faith of the police is irrelevant to the analysis when the police destroy material exculpatory evidence, the analysis is different if the evidence is only potentially useful: there is no due process violation unless there is bad faith conduct by the police in failing to preserve potentially useful evidence.  Illinois v. Fisher, 540 U.S. 544, 547-48 (2004); Arizona v. Youngblood, 488 U.S. 51, 58 (1988); United States v. Sivilla, 714 F.3d 1168 (9th Cir. 2013); Villafuerte v. Stewart, 111 F.3d 616, 625 (9th Cir. 1997).  Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been

1    subjected to tests, the results of which might have exonerated the defendant."

2    Youngblood, 488 U.S. at 57.  Another configuration of this test is that a

3    constitutional violation will be found if a showing is made that 1) the government

4    acted in bad faith, the presence or absence of which turns on the government's

5    knowledge of the apparent exculpatory value of the evidence at the time it was lost

6    or destroyed, and 2) that the missing evidence is "of such a nature that the defendant

7    would be unable to obtain comparable evidence by other reasonably available

8    means."  Sivilla, 714 F.3d at 1172 (internal quotation marks omitted) (finding

9    government did not act in bad faith where exculpatory value of destroyed vehicle

10   was not obvious);  United States v. Estrada, 453 F.3d 1208, 1212-13 (9th Cir. 2006)

11   (no bad faith in part because there was no evidence of "malicious intent" by

12   government).

13        Under any version of the test, Petitioner's claim fails because there was

14   simply no bad faith on the part of the government with respect to the items at issue.

15   First of all, the police were not responsible for the loss of Petitioner's cell phone,

16   which had been inadvertently turned over to Doe at the tow yard.  In fact, the

17   prosecution was not even aware of its location until Doe contacted the prosecutor's

18   office and informed them that she had it.  See supra at 19.  Thereafter, when the

19   prosecution repeatedly requested that the cell phone be returned, Doe was unable to

20   locate it.  Id.  Even though the cell phone was ultimately not found, the prosecution

21   made the cell phone records available to Petitioner.  Id.  Accordingly, there is no

22   evidence that the prosecution acted in bad faith with respect to preserving

23   Petitioner's cell phone.  Furthermore, Petitioner sets forth no explanation as to why

24   the cell phone itself had exculpatory value; simply asserting that he lost text

25   messages, emails and pictures from it is not sufficient without a more detailed

26   explanation as to the specific content and its relevance to his defense.  Lastly, since

27   the cell phone was never in the possession of the prosecution such that they could

28   examine its contents, it cannot be said that the prosecution was aware of any such

1    exculpatory evidence and acted in bad faith in failing to preserve it.

2           With respect to Doe's car, again there is no evidence that the government

3    acted with bad faith or that the car held potentially exculpatory value.  Petitioner

4    claims that Doe testified that she let him drive the car because it had mechanical

5    problems when, in fact, the car did not have any mechanical problems.  See supra at

6    21.  In other words, the exculpatory value of the car was in diminishing Doe's

7    credibility.  However, it cannot be said that the exculpatory value of the car was

8    readily apparent to the police.  See Sivilla, 714 F.3d at 1172.  As the state appellate

9    court pointed out, the sexual assault did not occur in the car and there was no reason

10   for the police to believe that Doe's testimony regarding why she permitted Petitioner

11   to drive her car would be subject to dispute.  See supra at 21.

12          Lastly, Petitioner also fails to show bad faith on the part of the police in the

13   destruction of the van.  Rather, the state appellate court reasonably determined that

14   the police attempted to preserve everything of value in the van when they retrieved,

15   inventoried, and preserved the contents of the van as well as took photographs of the

16   vehicle before releasing the van to the tow yard.  See supra at 20-21.  Petitioner

17   claims that the pictures of the rear window "'would have demonstrated that Jane

18   Doe made an unreliable report to the police officer when she said she had seen him

19   drive away.'"  Id. at 21.  However, as the state court pointed out, the police had no

20   reason to believe that the view out of the rear window would be in anyway relevant

21   to Petitioner's defense.  Id.

22          Because the state court's rejection of this claim was not an unreasonable

23   application of Supreme Court precedent or based on an unreasonable determination

24   of the facts in light of the evidence presented in the State court proceeding, 28

25   U.S.C. § 2254(d), Petitioner is not entitled to federal habeas relief.

26          **C.    <u>Admission of Evidence</u>**

27          Lastly, Petitioner attacks the admission of evidence of prior bad acts under

28   California Evidence Code §§ 1108 and 1101 as a violation of his right to due

1    process.

2          The state appellate court reviewed what took place and denied the claim.

3                           **Background**

4          On April 17, the court heard lengthy argument on a motion by
the prosecution to introduce evidence of defendant's prior sexual

5    assaults pursuant to Evidence Code sections 1108 and 1101,
subdivision (b).  According to the prosecutor, the victims in four

6    separate incidents did not know each other, and the nature of the
offenses, the type of victim, and the manner in which offenses were

7    committed were similar in that defendant used verbal threats to
intimidate strangers, take their cars, and commit sexual assaults.

8    And, according to the prosecutor, defendant's "excuses" were similar
in each case.

9
          Defendant objected to admission of the evidence.  As to the

10   incident involving Robin Doe, defendant argued that the district
attorney declined to prosecute based on inconsistencies in the

11   victim's story as well as a statement by her brother that she did not
appear to have been held against her will.  Further, according to

12   defendant, the district attorney indicated defendant knew too much
about the victim to never have met her before and believed there was

13   more to the story than the victim was telling.  Finally, the tape
recorded statements on which the district attorney relied had been

14   destroyed.

15         In response to defense counsel's objection that the taped
statements from Robin Doe and defendant had been destroyed, the

16   prosecutor pointed out that those statements were summarized in the
police report, and the police officer who took the statements was

17   available to testify.  Further, the victim would be subject to cross-
examination.

18
          As to Elizabeth Doe, defendant argued he was acquitted of

19   carjacking, assault to commit rape, and kidnapping to commit
another crime.  Thus, he contended, the jury did not believe he

20   attempted to strangle or rape Elizabeth or ripped off her shirt.

21         Over defendant's objection, the court admitted evidence
regarding the assaults on Elizabeth and Robin:

22
          "As to the January... 15, 2004 incident [involving Elizabeth

23   Doe], the Court finds that this may come in under [Evidence Code]
1108 and 1101(b).  In this case it's not as inflammatory as this

24   particular case that we're here on.  I don't see any probability of
undue confusion.  It's not too remote in time.  His due process issues

25   are certainly going to be taken care of.  We will not allow any–
you'll have ample opportunity to cross-examine the victim.

26
          "It's a very similar kind of offense here.  It's similar in

27   character.  It's similar with the way this whole incident in this case
went about.  I mean it wasn't exactly the same, but there were

28   several similarities that the Court noted.

United States District Court

For the Northern District of California

"No two cases are going to be exactly alike but I don't feel that the – I do feel that probative value outweighs the prejudicial effect in this case, so the Court will allow the January 15, 2004 case to be admitted in the case-in-chief, [Evidence Code] 1108 and 1101(b).

"As to the November 16, 2000 case [involving Robin Doe], in that case it's also very similar as to this situation, the way things occurred here. And I understand the concern about the material that has been lost. However, Sergeant Rullamas is available, the victim is available, and there is a summary there. And again the level of proof is only by preponderance of the evidence. But the Court finds that this, and that particular case, November 16, 2000 case it's no more inflammatory than this case that we're here. There's no probability of confusion, it's not too remote in time, the probative value clearly outweighs the prejudicial effect here, and it goes to a – does go to intent. So the Court will allow that under [Evidence Code] 1108 and 1101(b)." [FN7]

FN7. The court also allowed evidence of a third incident that occurred on September 9, 2007, although the prosecutor did not end up introducing that evidence at trial. And the court excluded evidence of a fourth incident on January 20, 2002, finding that it would cause an undue consumption of time.

**The Law**

As a statutory exception to the general prohibition against the evidence of character evidence (see Evid. Code, § 1101, subd. (a)), Evidence Code section 1108 permits the admission of evidence of defendant's prior sex offenses – even if uncharged – in an action in which defendant is accused of a sex crime. It expressly requires the trial court to conduct an analysis under Evidence Code section 352 before admitting such evidence. (Evid. Code, § 1108, subd. (a).) In other words, the trial court has the discretion to "exclude [the] evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of misleading the jury." (Evid. Code, § 352.) The court must carefully weigh the probative value of such evidence against the danger of undue prejudice, considering its "nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) "[T]he probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses, the close proximity in time of the offenses, and the independent sources of the evidence (the victim's) in each offense." (*Ibid.*)

**The Trial Court Did Not Abuse Its Discretion In
Admitting Evidence of Defendant's Prior Sex Offenses**

The testimony of Robin Doe and Elizabeth Doe was undeniably probative. As noted by the prosecutor, the two incidents were remarkably similar to this case, all involving defendant using threats to intimidate his victim, sexually assaulting (or attempting to sexually assault) her in a vehicle, and then stealing her car. The evidence was presented in a straightforward manner, with the victims testifying at trial. They were subject to cross-examination, and the jury was able to evaluate their credibility. Neither of the incidents were unreasonably remote: the incident involving Robin occurred 11 years before the trial, the assault of Elizabeth seven years before, with defendant incarcerated for a significant period between his 2004 assault on Elizabeth and his 2011 assault on Jane Doe. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 284 ["No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible."]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [no abuse of discretion in admitting 12-year-old evidence]; *People v. Burns* (1987) 189 Cal.App.3d 734, 738-739 ["A number of courts have considered the defendant's subsequent conduct a relevant consideration when the defendant seeks to exclude a prior conviction on the basis of remoteness"]; cf. *People v. Harris* (1998) 60 Cal.App.4th 727, 739 [a 23-year gap, coupled with the fact that defendant had led an "unblemished life" during that 23-year period, militated against admission of the prior offense].)

At the same time, the evidence was not unduly prejudicial. The testimony was not likely to confuse, mislead, or distract the jurors, nor was it inflammatory. Additionally, the trial court excluded evidence of a third incident, finding that it would lead to undue consumption of time. To be sure, the evidence may have damaged defendant's case, but "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

We thus conclude that the court did not abuse its discretion by allowing the testimony of Elizabeth Doe and Robin Doe pursuant to Evidence Code section 1108. [FN8] In light of this, we need not consider defendant's alternative argument that the trial court abused its discretion in admitting the evidence under Evidence Code section 1101, subdivision (b).

FN8. Defendant also raises a facial challenge to Evidence Code section1108, contending that the admission of prior conduct evidence to prove criminal disposition violated his right to due process. He acknowledges, however, that the

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1

2

3

> California Supreme Court rejected this argument in *Falsetta*, *supra*, 21 Cal.4th 903, 910-922, and that we are bound by *Falsetta*. He asserts it merely to preserve it for federal review.

4   (Ans. Ex. C at 19-23.)

5       Permitting a jury to hear evidence of prior crimes or bad acts may violate due

6   process. See Marshall v. Lonberger, 459 U.S. 422, 438-39 n.6 (1983); Fritchie v.

7   McCarthy, 664 F.2d 208, 212 (9th Cir. 1981) (citing Spencer v. Texas, 385 U.S.

8   554, 561 (1967)). A state court's procedural or evidentiary ruling is not subject to

9   federal habeas review, however, unless the ruling violates federal law, either by

10  infringing upon a specific federal constitutional or statutory provision or by

11  depriving the defendant of the fundamentally fair trial guaranteed by due process.

12  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d

13  918, 919-20 (9th Cir. 1991). Accordingly, a federal court cannot disturb on due

14  process grounds a state court's decision to admit evidence of prior crimes or bad acts

15  unless the admission of the evidence was arbitrary or so prejudicial that it rendered

16  the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir.

17  1995); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.), cert. denied, 479 U.S. 839

18  (1986).

19      The Ninth Circuit has held that the admission of other crimes evidence

20  violates due process where there are no permissible inferences the jury can draw

21  from the evidence (in other words, no inference other than conduct in conformity

22  therewith). See McKinney v. Rees, 993 F.2d 1378, 1384 (9th Cir. 1993); Jammal,

23  926 F.2d at 920. But it is generally upheld where: (1) there is sufficient proof that

24  the defendant committed the prior act; (2) the prior act is not too remote in time; (3)

25  the prior act is similar (if admitted to show intent); (4) the prior act is used to prove a

26  material element; and (5) the probative value of admitting evidence of the prior act is

27  not substantially outweighed by any prejudice the defendant may suffer as a result of

28  its admission. See McDowell v. Calderon, 107 F.3d 1351, 1366 (9th Cir.) (sentencer

may rely on prior criminal conduct not resulting in a conviction if the evidence has "some minimal indicium of reliability beyond mere allegation"), amended, 116 F.3d 364 (9th Cir. 1997), vacated in part by 130 F.3d 833, 835 (9th Cir. 1997) (en banc); Walters, 45 F.3d at 1357-58 (upholding state admission of prior on federal habeas review); Sanders v. Housewright, 603 F. Supp. 1257, 1259 (D. Nev. 1985) (same), aff'd, 796 F.2d 479 (9th Cir. 1986); see also United States v. Sneezer, 983 F.2d 920, 924 (9th Cir. 1992) (upholding admission of prior on direct review on similar grounds), cert. denied, 510 U.S. 836 (1993).

Here, the trial court's admission of Petitioner's prior bad acts was not arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Maass, 45 F.3d at 1357. Rather, the record shows that the trial court duly weighed the probative value against the prejudicial impact and found the former outweighed the latter. See supra at 24-25. Furthermore, the victims of the prior bad acts testified at trial and were subject to cross-examination such that the jury could assess their credibility. Id. at 26.

The admission of the prior bad acts is also sound under Ninth Circuit precedent: (1) the victims testified at trial and identified Petitioner as the culprit; (2) the acts were not too remote in time, having occurred eleven and seven years before trial; (3) the acts were "remarkably" similar in that Petitioner used threats to intimidate the victims, he sexually assaulted, or attempted to sexually assault, the victims in a vehicle, and then he stole their cars; (4) the prior acts were used to prove that Petitioner intended to sexually assault Doe; and (5) as reasonably determined by the trial court, the probative value of the prior bad acts was not substantially outweighed by any prejudice. See McDowell, 107 F.3d at 1366. Accordingly, it cannot be said that Petitioner's right to due process was violated by the admission of his prior bad acts.

Even if an evidentiary error is of constitutional dimension, the court must consider whether the error was harmless under Brecht v. Abrahamson, 507 U.S. 619

United States District Court
For the Northern District of California

(1993). <u>Dillard v. Roe</u>, 244 F.3d 758, 767 n.7 (9th Cir. 2001).  Here, the evidence against Petitioner was overwhelming despite Jane Doe's inconsistent statements: Doe immediately reported the rape; she was still wearing the tampon that had been in place when Petitioner raped her during her sexual assault examination; Petitioner stole her car and all her personal belongings; and Petitioner was found with her car and attempted to flee from the police, demonstrating consciousness of guilt.  <u>See</u> <u>supra</u> at 4-5.  Accordingly, it cannot be said that the jury would not have found Petitioner guilty but for the evidence of the prior bad acts

Because the state court's rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, 28 U.S.C. § 2254(d), Petitioner is not entitled to federal habeas relief.

**CONCLUSION**

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

///

1

**IT IS SO ORDERED**.

2

3    DATED: _____          EDWARD J. DAVILA

4                    1/4/2016

5

EDWARD J. DAVILA
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRIAN YOUNG,

               Plaintiff,

      v.

RON BARNES,

               Defendant.

Case No.  5:14-cv-03550-EJD

**CERTIFICATE OF SERVICE**

     I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

     That on 1/5/2016, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

     Brian  Young ID: T-15087
     California State Prison-Sacramento Facility/Bed: F-17-3
     P.O. Box 290066
     Represa, CA 95671

Dated: 1/5/2016

                         Susan Y. Soong
                         Clerk, United States District Court

                         By: _Elizabeth C Garcia_
                         Elizabeth Garcia, Deputy Clerk to the
                         Honorable EDWARD J. DAVILA

United States District Court
Northern District of California